Estate of Louis Alper, Deceased, Sam Alper, Executor, and Reva Alper, Surviving Wife v. Commissioner.
Estate of Alper v. Commissioner
Docket No. 79162.
United States Tax Court
T.C. Memo 1961-316; 1961 Tax Ct. Memo LEXIS 33; 20 T.C.M. (CCH) 1626; T.C.M. (RIA) 61316; November 20, 1961
*33 Held, the gains realized by Louis and Reva Alper during the taxable years 1950 and 1951 upon their stock in the five Manor corporations are taxable as ordinary income under the provisions of section 117(m) of the Internal Revenue Code of 1939. Phillip Nusholtz, Esq., National Bank Bldg., Detroit, Mich., for the petitioners. John J. Yurow, Esq., for the respondent. ARUNDELL
Memorandum Opinion ARUNDELL, Judge: Respondent determined deficiencies *34 in income tax for the calendar years 1950 and 1951 in the amounts of $17,513.40 and $29,210.16, respectively. The only issue is whether gains realized by Louis and Reva Alper in the taxable years 1950 and 1951 upon redemptions and sales of their stock in five building corporations, known as Greenfield Manors Nos. 1, 2, 3, 4, and 5, are taxable as ordinary income under the provisions of section 117(m) of the Internal Revenue Code of 1939. All of the facts were stipulated and are so found. During 1950 and 1951, the taxable years in issue, Louis Alper, deceased, and Reva Alper were husband and wife residing in Detroit, Michigan. They filed joint Federal income tax returns for the calendar years 1950 and 1951 with the then collector of internal revenue for the district of Michigan. Sam Alper of Detroit is the executor of the estate of Louis Alper. Louis Alper, sometimes referred to herein as Alper, was a builder and real estate developer. During the years in issue he was associated in several enterprises with one Carl Myers, deceased, also of Detroit. In 1948 Alper and Myers acquired some real property in the City of Detroit for the purpose of building 96 dwelling units thereon. *35 The price paid for the foregoing land was $49,600. Alper and Myers, by agreement, had 60 percent and 40 percent interests, respectively, in the land. Late in 1948 Alper and Myers and their wives formed three corporations known as Greenfield Manor No. 1, Inc., Greenfield Manor No. 2, Inc., and Greenfield Manor No. 3, Inc. (hereinafter sometimes referred to as Manor 1, Manor 2, and Manor 3). On April 7, 1949, Reva Alper and Jeanette Myers, the wife of Carl Myers, filed articles of incorporation for Manor 1, Manor 2, and Manor 3 with the Michigan Corporation and Securities Commission. The primary purpose of each corporation was to construct housing for rent or sale. The articles of incorporation filed by each corporation contemplated that this purpose would be accomplished by loans insured by the Federal Housing Administration (hereinafter sometimes referred to as the FHA). The total authorized capital stock of each corporation was listed in the articles as follows: Preferred
100 shares
par value $1 per share
Common A
3,000 shares
par value $1 per share
Common B
1,200 shares
price fixed for sale $1
per share (no par)
book value $1
The articles *36 provided that the whole or any part of the Class A common stock could be redeemed at not more than $100 for each share, plus declared but unpaid dividends, out of funds representing earned or donated surplus. In no event was any stock to be retired prior to the completion of construction of the housing project assigned to the corporation. Alper was president and treasurer of each corporation, Reva Alper was vice president, and Carl C. Myers, hereinafter sometimes referred to as Myers, was secretary during the years here in issue. Shortly before the formation of the three aforementioned corporations, Alper, on behalf of each corporation, applied to the FHA for mortgage insurance under section 608 of the National Housing Act. Each application set forth the proposed construction by the corporation involved of a housing project consisting of 32 dwelling units and requested a commitment for insurance by the FHA for advances of mortgage proceeds during the course of construction in the total amount of $259,200. On March 1, 1949, the FHA prepared project analyses wherein it estimated the present replacement cost of the property (including the housing projects when completed according *37 to plan) of Manor 1, Manor 2, and Manor 3 to be $305,862, $305,983, and $303,426, respectively. Included in the estimated replacement cost of each project was an estimated builder's fee in the approximate amount of $17,000. A commitment for insurance was issued by the FHA for each of the proposed projects on March 8, 1949, pursuant to which the FHA agreed to insure a first mortgage on each of the projects in an amount not to exceed $259,200. On May 13, 1949, building loan agreements for loans of $259,200 and mortgages to secure such loans were executed between Manor 1, Manor 2, and Manor 3, as mortgagors, and New York Life Insurance Company, as mortgagee, for the financing of the construction of the respective projects. On March 21, 1949, Reva Alper and Jeanette Myers were issued 600 and 400 shares, respectively, of Class B common stock of each corporation. On the same date the 100 shares of preferred stock of each corporation were issued to FHA. On May 31, 1949, Alper and Myers were issued 1,800 and 1,200 shares, respectively, of Class A common stock of each corporation. Additional shares subsequently were issued to Alper and Myers by each of the three corporations. In May *38 1949 the Detroit real estate which Alper and Myers had acquired in 1948 was divided into three parcels and conveyed to Manor 1, Manor 2, and Manor 3 as a contribution to the capital of each of the three corporations at an appraised value of $57,502.90, $58,067.10, and $57,890, respectively. These three parcels had been appraised by the FHA on March 1, 1949, at $20,550, $20,750, and $18,675, respectively. Entries were made in the journals of each of the three corporations crediting the donated surplus account in the amount of $1,352.64, representing architect's fees and corporation costs paid by Alper and Myers and donated to each corporation. On May 2, 1949, Alper and Myers formed a partnership, the M & A Building and Contracting Company (hereinafter sometimes referred to as M & A), in which they had 60 percent and 40 percent interests, respectively. On May 13, 1949, separate "lump sum" construction contracts were entered into between M & A and Manor 1, Manor 2, and Manor 3. Myers signed the contracts for the partnership as a partner, and Alper signed on behalf of each corporation as president. The contracts provided for the construction of the projects by the partnership as contractor. *39 As consideration therefor, the contractor was to receive from each corporation the actual cost of labor and materials used, plus the contractor's overhead and supervision costs and expenses. No provision was made for the payment of any builder's fee to the partnership. Construction of all three projects was commenced in 1949. Construction of the Manor 1 project was completed at the end of 1949. Construction of the Manor 2 and Manor 3 projects was completed in the early part of 1950. During the period of construction, each corporation received periodic payments of mortgage proceeds from the New York Life Insurance Company totaling $259,200. During the same period, Manor 1, Manor 2, and Manor 3 incurred building costs in the respective amounts of $202,562.68, $206,997.91 and $200,573.02. The building costs incurred by the corporations did not include any payments to the partnership for building fees or other compensation. The partnership did not realize any profit on the construction of any of the three projects. On December 30, 1949, Manor 1 redeemed 1,680 shares of the Class A common stock held by Alper for the amount of $27,720. On the same date, Manor 1 redeemed 1,120 shares *40 of the Class A common stock held by Myers for $18,480. During 1950 further redemptions of Class A common stock were made by all three corporations. The following schedule shows the number of shares which were redeemed by each corporation in 1950, the amounts received by Alper therefor, his cost basis of the shares redeemed, and the gain he realized: Shares
Amount
Gain
Corporation
Redeemed
Received
Cost Basis
Realized
Manor 1
39
$ 3,900
$ 270.28
$ 3,629.72
Manor 2
1,578
27,540
11,015.60
16,524.40
Manor 3
1,584
28,920
11,048.31
17,871.69
$60,360
$22,334.19
$38,025.81 All of the stock surrendered by Alper had been held by him for more than 6 months. During 1950 each corporation also made distributions in redemption of Class A stock held by Myers. The distributions to Alper and Myers, which were made in direct proportion to their respective stockholdings, were charged on the books of each corporation to capital stock to the extent of $1 for each share redeemed. The balance was charged to the donated surplus created by the contribution of land in May 1949. Manor 1 filed Federal income tax returns for the taxable years 1949 and *41 1950 wherein it reported net losses of $1,169.61 and $6,066.93, respectively. On its Federal income tax return for the taxable year 1951, it reported net income before net operating loss deduction in the amount of $3,818.88. Manor 2 filed Federal income tax returns for the fiscal year beginning April 7, 1949, and ending February 28, 1950, and for the fiscal year ending February 28, 1951, wherein it reported net losses in the amounts of $7,825.27 and $5,693.76, respectively. On its Federal income tax return for the taxable year ended February 29, 1952, it reported net income before net operating loss deduction in the amount of $3,914.52. Manor 3 filed Federal income tax returns for the fiscal year beginning April 7, 1949, and ending February 28, 1950, and for the fiscal year ending February 28, 1951, wherein it reported net losses in the amounts of $9,602.06 and $5,438.19, respectively. On its Federal income tax return for the taxable year ended February 29, 1952, it reported net income before net operating loss deduction in the amount of $3,669.10. In 1949 Alper acquired a parcel of real property in the City of Detroit for the purpose of building 64 dwelling units thereon. The *42 price paid for the foregoing land was approximately $33,000. In September 1949 Alper and his wife Reva formed two corporations known as Greenfield Manor No. 4, Inc., and Greenfield Manor No. 5, Inc. (hereinafter sometimes referred to as Manor 4 and Manor 5). On October 6, 1949, articles of incorporation for Manor 4 and Manor 5 were filed with the Michigan Corporation and Securities Commission. The provisions of the articles of incorporation of Manor 4 and Manor 5 were identical with the provisions of the articles of incorporation filed with respect to Manor 1, Manor 2, and Manor 3, referred to above. Alper was president and his wife Reva was vice president of Manor 4 and Manor 5. Shortly before the formation of the two aforementioned corporations, Alper, on behalf of each corporation, applied to the FHA for mortgage insurance under section 608 of the National Housing Act. Each application set forth the proposed construction of a housing project consisting of 32 dwelling units, by the corporation involved, and requested a commitment for insurance by the FHA for advances of mortgage proceeds during the course of construction in the total amount of $241,600. On October 3, 1949 after *43 the preparation of a project analysis with respect to each project, the FHA issued a commitment for insurance whereby it agreed to insure a first mortgage on each of the projects in an amount not to exceed $241,600. Shortly thereafter, building loan agreements for loans of $241,600 and mortgages to secure such loans were executed between Manor 4 and Manor 5, as mortgagors, and the First Mortgage Company of Detroit, as mortgagee, for the financing of the construction of the respective projects. On October 7, 1949, Alper and his wife Reva were each issued 1,500 shares of Class A common stock of Manors 4 and 5 and 600 shares of Class B common stock of Manors 4 and 5. On the same date the 100 shares of preferred stock of each of Manors 4 and 5 were issued to the FHA. In October 1949 the real estate which Alper had acquired earlier in the year was divided into two parcels and conveyed to Manor 4 and Manor 5 as a contribution to the capital of each corporation at an appraised value of $57,584.10 and $57,467.20, respectively. These two parcels had been appraised by the FHA on October 1, 1949, at $20,500 each. Entries were made in the journals of Manors 4 and 5 crediting the donated *44 surplus account in the amount of $716.73 representing "plans cost" of each parcel conveyed to Manor 4 and Manor 5, respectively. In the latter part of 1949 each corporation, acting as its own contractor, commenced construction of its assigned project. The Manor 4 and Manor 5 projects were completed in March 1950 and May 1950, respectively. During the period of construction, each corporation received periodic payments of mortgage proceeds from the First Mortgage Company of Detroit totaling $241,600. During the same period, Manor 4 and Manor 5 incurred building costs in the respective amounts of $222,504.34 and $223,617.80. During 1950 and 1951, Manor 4 and Manor 5 redeemed Class A common stock of Alper and his wife Reva. The following schedule shows the number of shares redeemed by each corporation, the amounts received therefor by Alper and his wife Reva, the cost basis of the shares redeemed, and the gain realized: Shares
Amount
Gain
Corporation
Redeemed
Received
Cost Basis
Realized
1950
Manor 4
1,810
$20,000.00
$12,522.25
$ 7,477.75
Manor 5
2,200
17,600.00
15,195.71
2,404.29
$37,600.00
$27,717.96
$ 9,882.04
1951
Manor 4
225
$ 9,731.25
$ 1,556.62
$ 8,174.63
Manor 5
127
8,102.60
877.20
7,225.40
$17,833.85
$ 2,433.82
$15,400.03
*45 All of the stock surrendered by Alper and his wife Reva had been held by them for more than 6 months. The distributions to Alper and his wife Reva were charged on the books of each corporation to capital stock to the extent of $1 for each share redeemed. The balance was charged to the donated surplus created by the contribution of land in October 1949. In 1951 Alper and his wife Reva sold the balance of their Class A stock and all of their Class B stock in the two corporations to third parties. The following schedule shows the shares sold in 1951, the amounts received therefor by Alper and his wife Reva, the cost basis of the shares sold, and the gain realized: Corporation and
Shares
Amount
Gain
Class of Stock
Sold
Received
Cost Basis
Realized
Manor 4 - Class A
965
$43,349.68
$4,426.25
$38,923.43
Manor 4 - Class B
1,200
3,000.00
1,200.00
1,800.00
Manor 5 - Class A
673
42,937.40
2,433.81
40,503.59
Manor 5 - Class B
1,200
3,000.00
1,200.00
1,800.00
$92,287.08
$9,260.06
$83,027.02
Less expenses of sale
1,800.49
Net gain
$81,226.53 All of the stock sold by Alper and his wife Reva had been held by them for *46 more than 6 months. Manor 4 and Manor 5 filed Federal income tax returns for the fiscal year beginning October 7, 1949, and ending August 31, 1950, wherein they reported net losses in the amounts of $3,463.81 and $3,839.15, respectively. Each corporation reported net income before net operating loss deduction of less than $3,000 for the fiscal year ending August 31, 1951. On May 15, 1956, Robert B. Wolf, general counsel for FHA, directed a letter to Manors 1, 2, and 3 asserting that the FHA had information that funds of those corporations had been improperly distributed. On February 20, 1957, each corporation directed a letter to Norman P. Mason, Commissioner, FHA, proposing a settlement of the differences between the FHA and the respective corporations. On March 21, 1957, A. M. Prothro, director legal division, FHA, directed a letter to the attorney for the three corporations advising that their proposal of settlement had been accepted by the FHA. On April 4, 1957, Prothro, acting general counsel for the FHA, advised counsel for Manors 4 and 5 that similar action would be required with respect to those corporations. With respect to all corporations, the funds claimed by *47 the FHA to have been improperly distributed were the funds used to redeem stock of Manors 1, 2, 3, 4, and 5 in 1949, 1950, and 1951. In the statutory notice of deficiency, the respondent determined that Manors 1, 2, 3, 4 and 5 were "collapsible corporations" within the meaning of section 117(m) of the Internal Revenue Code of 1939, [1] and that the above-mentioned gains in the total amounts of $47,907.85 for 1950 and $96,626.56 for 1951 derived by Alper and his wife Reva from redemptions and sales of stock in those corporations were taxable as ordinary income rather than as long-term capital gains as reported by Alper and his wife Reva in their joint Federal income tax returns. *48 Petitioners, in contending that the respondent's determination is in error, argue primarily (1) that the determination is barred by the doctrine of collateral estoppel, (2) in the alternative, that none of the gains determined by the respondent is reportable even as capital gains in 1950 or 1951 because the moneys were received illegally and improperly, and (3) finally, that the corporations were not availed of with a view to the action described in section 117(m)(2)(A) of the 1939 Code. Respondent in his reply brief insists that some of the contentions now made by petitioners are raised for the first time on brief and are therefore not properly before the Court, citing Erwin Gerber, 32 T.C. 1199. As we said in the Gerber case: Under our rules the petition must clearly set forth each assignment of error and must allege facts to support each assignment. n1 [Footnote omitted.] The petition contains no assignment of error relating to petitioners' arguments (1) and (2). However, the stipulation of facts, signed by counsel for both parties, stipulates facts upon which these arguments are based. Although the stipulation states that: Each party, however, reserves *49 the right to object to the admissibility in evidence of such facts or exhibits on the ground of materiality or relevancy and the right to introduce further evidence material to the issues in this proceeding not inconsistent with the facts and exhibits herein stipulated: the respondent has not objected to the admissibility in evidence of any of the facts or exhibits so stipulated. Under such circumstances, we do not think respondent is prejudiced by the state of the pleadings. Therefore, we will treat the issues argued by petitioners as properly before us. On the matter of collateral estoppel it may be noted that Alper and his wife Reva filed a petition with this Court (Docket No. 51798) for the year 1949 involving cash distributions to them from Manors 1, 2, and 3. In Docket No. 51798, we held, in a Memorandum Findings of Fact and Opinion, that such cash distributions were taxable to Alper and his wife Reva pursuant to the provisions of section 115(d) [2] of the 1939 Code and, in accordance therewith, since the stock in Manors 1, 2, and 3 had been held for more than 6 months, the distributions should first be applied in reduction of the adjusted basis of the stock, and any excess *50 over such basis taxable as long-term capital gain. Section 117(m) had no application to the issue involved in Docket No. 51798 for the reason that the only year there involved was the year ending December 31, 1949, and section 117(m) was not then in existence. Section 117(m) was added to the 1939 Code by section 212 of the Revenue Act of 1950 (approved September 23, 1950). Section 212(b) of the 1950 Act specifically provides that subsection (m) "shall be applicable to taxable years ending after December 31, 1949, but shall apply only with respect to gain realized after such date." See in this connection Emanuel E. Falk, 36 T.C. 292, wherein we held that where all the controlling transactions giving rise to the gains there involved occurred in 1949, section 117(m) could have no application.
*51 It is our opinion that the doctrine of collateral estoppel has no application in this proceeding. While the factual situation in 1949 is substantially the same, except for amounts, as the factual situation in 1950 and 1951 in that the same evidence was submitted in both cases, the statutory law applicable to 1950 and 1951 is entirely different from the statutory law applicable to 1949. The first argument of petitioners is, therefore, rejected. See Commissioner v. Sunnen, 333 U.S. 591. Regarding petitioners' alternative contention that none of the gains determined by the respondent is reportable in 1950 or 1951, the only evidence in the record bearing upon this contention consists of correspondence between the FHA and the five corporations. These letters indicate only that the FHA questioned the propriety of the distributions and that the settlements between the FHA and the corporations were reached in the year 1957. There is no evidence whatsoever as to the terms of the settlements. Alper and his wife Reva received the funds distributed to them under a claim of right without restrictions as to their disposition. They, therefore, received taxable income in the years *52 in which the distributions were made even if it could still be claimed that they were not entitled to retain the money and even if they might have been adjudged liable to restore its equivalent. North American Oil Consolidated v. Burnet, 286 U.S. 417. Petitioners also argue, under this alternative contention, that the receipt of the funds distributed by the five corporations was tantamount to embezzlement and, therefore, not taxable under the doctrine of Commissioner v. Wilcox, 327 U.S. 404. The petitioners' attempt to attribute criminality to the recipients of the distributions is not only wholly lacking in merit, it is of no avail. The Wilcox doctrine was overruled by the Supreme Court in its recent decision in James v. United States, 366 U.S. 213, holding that embezzled funds constitute taxable income. Petitioners' alternative arguments are likewise rejected. Petitioners' final argument is that the five Manor corporations were not "collapsible corporations" as that term is defined in section 117(m)(2)(A). Petitioners do not contend that any of the "Limitations" specified in paragraph (3) of section 117(m) are applicable. They merely contend *53 that even assuming that the corporations were "availed of" within the meaning of section 117(m), such availing was not coupled with the requisite "view" proscribed in section 117(m)(2)(A) and that it is unfortunate that both Alper and Myers are dead and could not have given testimony regarding their intent or view. In support of this contention, petitioners cite our decisions in Charles J. Riley, 35 T.C. 848, and Maxwell Temkin, 35 T.C. 906, in which cases we held that the proscribed view was lacking and that the corporations there involved were not collapsible corporations. The applicable regulations are Regulations 111, section 29.117-11(b), added by T.D. 5999 (1953-1 C.B. 187, 189), and are printed in the margin. [3] Petitioners have not shown any of the circumstances mentioned in these regulations which might take the Manor corporations out of the inhibited class of collapsible corporations. *54 In a statement attached to the deficiency notice the respondent advised petitioners that "It is held in accordance with the provisions of Section 117(m) * * *" that the Manor corporations "were collapsible corporations and that your gains * * * represent gains from the sale or exchange of property which was not a capital asset." Implicit in this determination is the determination that the requisite "view" was present. The burden of proving the contrary rests upon petitioners. Rose Sidney, 30 T.C. 1155, affd. 273 F. 2d 928 (C.A. 2, 1960). We hold petitioners have not met that burden. The cases of Charles J. Riley and Maxwell Temkin, supra, are of no help to petitioners. Those cases involved sales of stock which were held to have been prompted by special circumstances not present or anticipated at the time construction was in progress. No such special circumstances were either alleged or proven in the instant case. We hold that the gains here realized are taxable as ordinary income under the provisions of section 117(m) of the Internal Revenue Code of 1939. Because of other adjustments not here at issue, Decision will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (m) Collapsible Corporations. - (1) Treatment of gain to shareholders. - Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset. (2) Definitions. - (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the * * * construction * * * of property * * * with a view to - (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and (ii) the realization by such shareholders of gain attributable to such property.↩
2. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (d) Other Distributions From Capital. - If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. * * *↩
3. (b) Determination of collapsible corporation. - With respect to taxable years ending after December 31, 1949, but only with respect to gain realized after such date, a collapsible corporation is defined by section 117(m)(2)(A) to be a corporation formed or availed of principally for the * * * construction * * * of property * * * with a view to (1) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and (2) the realization by such shareholders of gain attributable to such property. * * *
A corporation is formed or availed of with a view to the action described in section 117(m)(2)(A)↩ if the requisite view existed at any time during the * * * construction * * * referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the * * * construction * * * (other than circumstances which reasonably could be anticipated at the time of such * * * construction * * *, the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange, or distribution is attributable to circumstances present at the time of the * * * construction, * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.